# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | | |
|---|---|---|
| **ENITAN AYODEJI LIJADU** | * | **CIVIL ACTION NO. 06-0518**<br>Section P |
| **VERSUS** | * | **JUDGE JAMES** |
| **IMMIGRATION AND NATURALIZATION SERVICE, ET AL.** | * | **MAGISTRATE JUDGE HAYES** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to confirm default judgment filed by *pro se* plaintiff, Enitan Ayodeji Lijadu as a motion for summary judgment [doc. # 75]. For reasons assigned below, it is recommended that plaintiff's motion to confirm a default judgment be **GRANTED**.

### Procedural History

On August 17, 2004, Immigration & Customs Enforcement ("ICE") took Enitan Lijadu into custody and initiated removal proceedings. On December 5, 2004, ICE transferred Lijadu to the Tensas Parish Detention Center ("TPDC") in Waterproof, Louisiana where he remained as an immigration detainee until shortly before his December 12, 2006, removal from the United States.

On March 27, 2006, Lijadu filed the above-captioned civil rights complaint[1] against ICE

---

[1] The complaint arises under 42 U.S.C. § 1983 insofar as it alleged constitutional violations by "state actors." It is cognizable under *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999 (1971) insofar as it alleged constitutional violations by federal employees.

District Director, John Mata; ICE Deportation Officer, Timothy Pelamati (incorrectly named as Agent Palamante); TPDC Warden, Dale Dauzat; and TPDC Medical Administrator, Pam Poole.[2] Lijadu sought injunctive relief and compensatory damages against defendants due to inadequate medical care and an unsafe condition at TPDC which caused him to slip and fall and break his wrist.[3]

On July 18, 2006, the court directed service upon defendants. Dale Dauzat was the only defendant initially served; he appeared and was subsequently dismissed on summary judgment. (*See*, March 15, 2007, Judgment). On May 25, 2007, defendants Mata and Pelamati filed a motion to dismiss, or alternatively, motion for summary judgment pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(6), and 56. [doc. # 56]. The court granted the motion and dismissed said defendants on August 27, 2007. [doc. # 65].

Following multiple service attempts, the marshals service eventually perfected service upon the sole remaining defendant, Pam Poole, on March 25, 2008. (*See*, April 7, 2008, Return of Service [doc. # 73]). Nevertheless, Poole failed to file responsive pleadings. Accordingly, on June 3, 2008, the undersigned issued a Notice of Intent to Dismiss due to plaintiff's failure to initiate default proceedings against Poole. LR 41.3W (Notice of Intent to Dismiss [doc. # 74]).[4]

---

[2] The now defunct Immigration and Naturalization Service ("INS") was named as a defendant in the caption of the complaint. However, no allegations were levied against the former government agency in the body of the complaint, as amended. The court has since stricken INS as a defendant. (March 27, 2007, Order).

[3] As Lijadu is no longer in custody, his claim for injunctive relief is moot. *See, Beck v. Lynaugh*, 842 F.2d 759, 762 (5th Cir. 1988) (citations omitted).

[4] The court directed the Clerk of Court to mail a copy of the notice to defendant, Poole. *Id*.

On July 10, 2008, plaintiff responded to the court's notice with a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. [doc. # 75]. The motion recited plaintiff's allegations and requested a $ 5 million judgment for compensatory and punitive damages against defendant Pam Poole. *Id*.

On October 9, 2008, the undersigned questioned whether plaintiff's complaint contained adequate factual allegations to establish that Poole harbored the requisite state of mind to support a finding of deliberate indifference. (October 9, 2008, Order [doc. # 77]). The undersigned afforded plaintiff 45 days to submit any additional competent summary judgment to establish the elements of his constitutional claim against Poole. *Id*. The order further notified plaintiff that because Poole had not made an appearance in the case, the two-step default process may be a more appropriate procedural vehicle to prosecute his claim against Poole. *Id*. (citing Fed.R.Civ.P. 55; LR 55.1W).

In response, plaintiff requested an entry of default against Poole on November 25, 2008 [doc. # 78].[5] On December 2, 2008, the Clerk of Court so obliged. (Notice of Entry of Default [doc. # 80]. The Clerk sent a copy of the notice of default to Poole at the address where service was perfected. *Id*. More than nine months have elapsed since service, and more than a month has passed since the entry of default, yet Poole has failed to appear in this matter. Due to Poole's uncured default status, the undersigned will construe plaintiff's pending motion for summary judgment as a motion to confirm default judgment. *See, U.S. v. Star-Tel, Inc.*, 2005 WL 2810701 (S.D. Tex. Oct. 26, 2005) (construing plaintiff's motion for summary judgment as motion for

---

[5] Plaintiff now resides in Nigeria and experiences some delay with the trans-Atlantic postal service. (*See*, doc. # 59).

3

default judgment). The matter is now before the court.

### Default Judgment

A defendant's default does not automatically warrant the entry of a default judgment. *Nishimatsu Const. Co., Ltd. v. Houston Nat. Bank*, 515 F.2d 1200 (5th Cir. 1975). The defendant, by his or her default, admits solely the well-pleaded allegations of fact within plaintiff's petition. *Id*. (citation omitted). "[A] default judgment may be lawfully entered only 'according to what is proper to be decreed upon the statements of the bill, assumed to be true,' . . . " *Id*. (quoting *Thomson v. Wooster*, 114 U.S. 104, 113, 5 S.Ct. 788, 792 (1885)). Moreover, "[c]onduct on which liability is based may be taken as true as a consequence of the default." *Frame v. S-H, Inc.*, 967 F.2d 194, 205 (5th Cir. 1992). In assessing the defaulting defendant's liability in this pro se § 1983 claim, the court also relies upon plaintiff's properly authenticated medical and prisoner records that have been filed in the court record.[6]

---

[6] In *Nishimatsu*, the Fifth Circuit declined to address whether otherwise deficient pleadings could be buttressed by proof taken before the court. *See, Nishimatsu*, 515 F.2d at 1206, n5. When confirming a default judgment, however, the federal rules authorize the court to take additional evidence to, among other things, establish the truth of any allegation or to investigate any other matter. *See*, Fed.R.Civ.P. 55(b). Moreover, the court previously ordered Lijadu to provide a copy of his medical record so that it could determine the disposition of his claims. (May 16, 2006, Mem. Order [doc. # 5]). When plaintiff was unable to obtain the requested documents from defendants, the court ordered defendants to provide a certified copy of plaintiff's medical file and certified copies of his grievances and responses thereto. (June 22, 2006, Mem. Order [doc. # 8]). Defendant, Dale Dauzat, so complied. [doc. # 11]. If this evidence may used to determine the sufficiency of plaintiff's claims, it certainly may be used to support plaintiff's factual allegations against a defendant in default. *See, Banuelos v. McFarland*, 41 F.3d 232, 233 -234 (5th Cir. 1995) (court may use "adequately identified or authenticated" prison records to dismiss IFP complaint as frivolous). In fact, the evidence merely confirms and amplifies the allegations in plaintiff's complaint.

**Discussion**

a) **Plaintiff's Allegations Against Poole**

Plaintiff alleges that as the TPDC medical administrator, Pam Poole was deliberately indifferent to his serious medical needs by failing to timely schedule needed medical appointments or to obtain necessary prescription refills. Specifically, plaintiff alleges that Poole knowingly: 1) delayed for eight weeks appropriate orthopedic care for his fractured arm; 2) failed to refill his ulcerative colitis medication for eight months; 3) failed for sixteen months to schedule clinical examinations for his preexisting conditions of ulcerative colitis and status HIV positive; and 4) waited at least 15 months to obtain a dental appointment to repair his broken dentures. (Pl. Amend. Compl., pgs. 1-3, 10 [doc. # 6]).

b) **Constitutional Right to Adequate Medical Care**

During the period at issue, plaintiff was an immigration detainee. The constitutional rights of immigration detainees and pretrial detainees are analyzed alike. *See, Brown v. Ridge*, 2006 WL 1581167 (W.D. La. 1/19/06 ) and *Ortega v. Rowe*, 796 F.2d 765, 767 (5th Cir. 1986). A pretrial detainee's constitutional right to medical care (as enforced against a state actor) stems from the due process guarantee of the Fourteenth Amendment. *Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir. 2000). When a pretrial detainee asserts a claim for the denial of medical care which is directed toward a particular incident, it is properly analyzed as an episodic act case, and a deliberate indifference standard is applied. *Scott v. Moore,* 114 F.3d 51, 53 (5th Cir. 1997) (en banc) (quoting *Hare v. City of Corinth,* 74 F.3d 633, 644 (5th Cir.1996) (en banc)); *Nerren v. Livingston Police Dept.,* 86 F. 3d 469 (5th Cir. 1996). This is the same standard applicable to convicted prisoners whose claims are analyzed under the Eighth Amendment. "[T]here is no

significant distinction between pretrial detainees and convicted inmates concerning basic human needs such as medical care." *Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir.2001).

Thus, to establish liability, a detainee must "show that a state official acted with deliberate indifference to a substantial risk of serious medical harm and that injuries resulted." *Wagner v. Bay City, Tex.*, 227 F.3d 316, 324 (5th Cir. 2000); *see also Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285 (1976). Deliberate indifference in the context of an episodic failure to provide reasonable medical care to a pretrial detainee means that: (1) the official was aware of facts from which an inference of substantial risk of serious harm could be drawn; (2) the official actually drew that inference; and (3) the official's response indicates that the official subjectively intended that harm occur. *Thompson v. Upshur County, Tx.,* 245 F.3d 447, 458-59 (5th Cir. 2001). "[T]he failure to alleviate a significant risk that [the official] should have perceived, but did not is insufficient to show deliberate indifference." *Domino v. Texas Department of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). Moreover, "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson*, 245 F.3d at 459. "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997); *see also Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999).

Prisoners are not entitled to the "best medical care money can buy." *See*, *Mayweather v. Foti,* 958 F.2d 91 (5th Cir. 1992); *Woodall v. Foti*, 648 F.2d 268 (5th Cir. 1981). "[T]o maintain a viable claim for delayed medical treatment there must have been deliberate indifference, which results in harm." *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993) (citations omitted). Withholding dental treatment to a prisoner or detainee may constitute deliberate indifference.

*Green v. Hendrick Medical Center*, 2001 WL 300844 (5th Cir. Mar. 7, 2001) (unpubl.) (citing *Harris v. Hegmann*, 198 F.3d 153, 159-160 (5th Cir. Dec. 8, 1999).[7] In addition, a one month delay in addressing a prisoner's known medical needs may demonstrate deliberate indifference. *See, Bradley v. Puckett*, 157 F.3d 1022, 1025 -1026 (5th Cir. 1998) (prison officials failed to provide prisoner with regular bathing schedule at clinic).

### c) Evidence and Allegations Support Finding of Deliberate Indifference

Plaintiff alleges that Pam Poole was the medical administrator or head of the TPDC medical department. (Pl. Amend. Compl., pg. 1). As such, any decision to schedule a hospital or clinic appointment for a detainee went through her office. *Id*. Lijadu states that as soon as he arrived at TPDC, he informed the medical staff about his preexisting medical conditions and his need for continued monitoring. *Id*.

As early as December 15, 2004, plaintiff's medical record reveals that the prison medical staff had called for referral to a GI specialist. (Physician's Order Sheet [doc. # 11-2, pg. 11]). Further, on February 21, 2005, prison medical staff indicated that plaintiff required a dental referral due to his broken denture which was causing him to suffer inflamed gums, an inability to eat, and weight loss. (Physician's Order Sheet [doc. # 11-2, pg. 10). There is no indication in plaintiff's certified prison medical record that TPDC endeavored to obtain approval for a dental appointment until May 2005. *See*, discussion, *infra*.[8]

---

[7] Another circuit has recognized an Eighth Amendment claim where the inmate's lost dentures caused bleeding gums, and impaired the prisoner's ability to eat. *Green, supra* (citing *Hunt v. Dental Dep't.*, 865 F.2d 198, 200 (9th Cir. 1989)).

[8] In support of their motion to dismiss, defendants, Mata and Pelamati, attached copies of Treatment Authorization & Consultation Forms submitted by TPDC on behalf of Lijadu. [*See*, doc. # 56-4]. They included a request for a dental referral dated March 15, 2005, that was denied

On January 16, 24, and February 2, 2005, plaintiff filled out Sick Call requests to follow up on his GI Clinic appointments. [doc. # 11-5, pgs. 20, 24-25]. On January 23, 2005, the TPDC sent a Treatment, Authorization & Consultation Form ("TAR") to Immigration Health Services ("IHS")[9] to obtain permission for plaintiff to go to the Bio Disease clinic due to his pain and poor appetite. [doc. # 11-5, pg. 23]. However, the request was "pended." *Id*. On February 16, 2005, IHS again denied a request for plaintiff to go to the Bio Disease Clinic because TPDC did not send enough supporting clinical information. [doc. # 11-5, pg. 26]. IHS instructed TPDC to resubmit the request with more detailed clinical information. *Id*. There is no indication of any follow-up requests for approval of clinical appointments until May 2005 – over three months later. *See* discussion, *infra*.

Plaintiff alleges that on March 21, 2005, he filed an administrative grievance with the prison because his clinical examinations had not been scheduled. (Amend. Compl., pg. 1). On April 28, 2005, plaintiff spoke with Pam Poole about his need to have his clinic appointments scheduled. *Id*. at pg. 2; *see also*, [doc. # 11-2, pg. 27]. She told him that the appointments had to be approved by immigration authorities before they could be scheduled. *Id*. According to plaintiff, Poole told him that his request for a clinic appointment had been denied by IHS, and

---

due to insufficiently detailed clinical information. *Id*. at pg. 7. However, because these documents were not properly authenticated, the undersigned has not relied upon them for purposes of this motion. *See, Banuelos, supra*.

[9] The Division of Immigration Health Service, a bureau of the Department of Health and Human Services, oversees health care services for immigration detainees in federal, state, and local jails pursuant to a managed care/utilization management system. *Bennett v. Division of Immigration Health Services,* 2006 WL 845864 (E.D. Pa. March 28, 2006).

8

that it would have to be resubmitted. *Id.*[10]

Despite Poole's personal awareness in April 2005 of plaintiff's need for clinical appointments, TPDC waited almost two more weeks to again request approval for outside treatment. [*See*, doc. # 11-5, pg. 27]. However, IHS denied TPDC's request for a dental appointment to repair plaintiff's broken denture because he was not eligible for routine care until he had been in custody for ten months, i.e. June 17, 2005. [doc. # 11-5, pg. 27, 11-4, pg. 47]. IHS instructed TPDC to resubmit a request for routine care after that time. *Id.* Nonetheless, there is no evidence that TPDC resubmitted the request for a dental appointment until three to four months later. *See*, discussion, *infra*.

On May 11, 2005, TPDC also submitted a TAR to obtain permission for Lijadu to go to the GI clinic to rule out colon cancer due to blood in his stool. [doc. # 11-5, pg. 13]. IHS denied the request due to lack of supporting clinical information. *Id.*[11] Subsequent physician's order sheets from May 27, 2005, and June 10, 2005, called for internal medicine, GI, HIV, and dental appointments. [doc. # 11-2, pg. 12].

On June 10, 2005, IHS approved an internal medicine visit due to plaintiff's weight loss, ulcerative colitis, and status HIV positive. [doc. # 11-4, pg. 38]. A handwritten note stated that TPDC scheduled the appointment for two months later – September 14, 2005. *Id.*[12] According

---

[10] If Poole was aware that IHS had denied the facility's request for clinical appointments, then she should also have been aware that the reason that IHS denied the request was because the requests lacked supporting information. *Id.*

[11] The website printout of the TAR suggests that it was denied on May 25, 2005. *Id.*

[12] There is some evidence that TPDC scheduled an appointment for July 14, 2005, but failed to transport Lijadu to the appointment. [*See*, doc. # 11-2, pg. 26; Compl., Exh. B].

9

to plaintiff, however, his first clinical examination after arrival at TPDC did not occur until April 2006. (Amend. Compl., pg. 2).[13] Plaintiff alleges that he suffered physical and mental pain and suffering as a result. [doc. # 11-5, pg. 44].

Nurse's notes from August 2, 2005, reveal that medical staff advised Lijadu to speak with Pam Poole about his lack of dentures and his need for a soft diet. [doc. # 11-2, pg. 19]. The nurse noted that she placed plaintiff's chart on Poole's desk. *Id*.

On August 8, 2005, TPDC submitted a TAR to IHS which stated, "50 year old, dx as above broke partial Dental Plate. Already has digestive problems related to above diagnoses, unable to eat regular foods properly without Dentures. Examined by Doctor Lee on 8/8/05. She wrote order and requested paperwork be forwarded to INS again to try and get Dental Approval. Currently is given Boost Supplement B.i.d." [doc. # 11-4, pg. 40]. There is no response by IHS to this TAR in plaintiff's medical record.[14]

On August 12, 2005, the TPDC's in-house physician, Dr. Lee, noted that plaintiff had exhausted his supply of Asacol medication. [doc. # 11-2, pg. 26].[15] She indicated that plaintiff's

---

[13] At the end of October 2005, plaintiff did have some lab work done due to his weight loss, malaise, and HIV. [doc. # 11-4, pg. 19].

[14] However, in the unauthenticated records submitted by the INS defendants, there is evidence that IHS approved the TAR and ordered an initial comprehensive dental examination. [*See*, doc. # 56-4, pgs. 10-11]. Nevertheless, there is no indication that TPDC scheduled a dental examination following this approval.

[15] Asacol® or mesalamine, is an anti-inflammatory medicine, used to treat ulcerative colitis, a condition in which the bowel is inflamed. Mesalamine reduces bowel inflammation, diarrhea (stool frequency), rectal bleeding, and stomach pain. *See, Medline Plus, Medical Encyclopedia, A Service of the United States National Library of Medicine and the National Institutes of Health*, http://www.nlm.nih.gov/medlineplus/druginformation.html.

medication should be restarted. *Id*.[16] On August 19, 2005, Lee prescribed Sulfasalazine, as a generic substitute for the Asacol.[17] However, by September 2, 2005, Lijadu reported to medical staff that the Sulfasalazine was upsetting his stomach. [doc. # 11-2, pg. 25].

On August 19, 2005, Lijadu filed an administrative grievance with the TPDC due to the facility's failure to: refill his Asacol medication, schedule clinic appointments, and replace his broken dentures. (Compl., Exh. B). The grievance explained that the lack of Asacol medication caused plaintiff to suffer painful discomfort and increased his risk of colon cancer. *Id*. Lijadu further explained that his medical conditions required regular examinations by an infectious disease specialist and a GI specialist. *Id*. Finally, he stated that without dentures, it was extremely difficult for him to chew or eat without his gums becoming sore and blistered. *Id*.

On, or about August 30, 2005, Pam Poole responded to plaintiff's grievance. *Id*. She stated that IHS did not approve medication which was not on its formulary. *Id*. However, she assured plaintiff that she would place him on the list to be further evaluated by the TPDC physician. *Id*. By responding to plaintiff's grievance that detailed his deficient medical care and its serious adverse effects on his health, Poole was clearly aware of plaintiff's plight and the acute ramifications of continued inaction or delay. Moreover, the fact that the grievance was routed to Poole for a response implies that she had the authority to redress plaintiff's complaints.

---

[16] She also noted Lijadu's lost dentures. *Id*.

[17] Sulfasalazine is used to treat bowel inflammation, diarrhea (stool frequency), rectal bleeding, and abdominal pain in patients with ulcerative colitis, a condition in which the bowel is inflamed.. Sulfasalazine is in a class of medications called anti-inflammatory drugs. It works by reducing inflammation (swelling) inside the body. *See, Medline Plus, Medical Encyclopedia, supra*.

Indeed, at approximately the same time that Poole responded to plaintiff's grievance, TPDC submitted a September 3, 2005, TAR to IHS for approval of Asacol because Sulfasalazine was upsetting Lijadu's stomach. [doc. # 11-4, pg. 35]. That same day, TPDC submitted another TAR to obtain authorization to schedule a dental appointment to replace plaintiff's dentures. *Id*. at pg. 36. On September 7, 2005, IHS denied the request for a dental appointment due to inadequate information. *Id*. at pg. 34. Six months later, TPDC still had not obtained permission for a dental visit to repair plaintiff's prosthesis. (Amend. Compl. pg. 2; doc. # 11-2, pg. 4). During this period, there is no indication that Poole expended any further effort to obtain approval for plaintiff's dentures.

Plaintiff's certified medical record adduced by TPDC does not indicate the fate of the September 3, 2005, TAR for Asacol.[18] What remains clear, however, is that TPDC did not refill plaintiff's Asacol medication for another seven months. (*See*, Pl. Amend. Compl., pg. 3). Thus, despite Poole's awareness of plaintiff's need for Asacol as set forth in his August 2005 grievance, she authorized one attempt during that time frame to obtain approval for the medication. After IHS denied the request because of inadequate information, there is no evidence that Poole re-submitted the request until April 11, 2006, when plaintiff again spoke to her. [doc. # 11-2, pg. 15].[19]

The day after Lijadu's April 11, 2006, conversation with Poole, she instructed her staff nurse to submit a TAR to IHS for approval of plaintiff's Asacol medication. [*See*, doc. # 11-1,

---

[18] According to the unauthenticated evidence submitted by the INS defendants, IHS approved the Asacol request in September 2005. [doc. # 56-5, pg. 4].

[19] By this time, plaintiff had been without his colitis medication for so long that he was unable to control his bowel movements. (Pl. Amend. Compl., pg. 3).

pgs. 33-36; Amend. Compl., pg. 4]. IHS again initially denied and "pended" the request due to lack of supporting information. *Id*. This time, however, TPDC followed up and obtained IHS approval a few days later. *Id*. Clearly, had Poole exerted the same minimal persistence months earlier, there is every indication that she could have obtained IHS approval for plaintiff's necessary treatment and medication at that time.

Indeed, following an initial denial, TPDC successfully obtained approval from IHS for plaintiff to see an orthopedist for a broken arm that he suffered in early September 2005. [doc. # 11-4, pgs. 28-32]. Although IHS approved the orthopedic consultation on or about September 13, 2005, TPDC inexplicably scheduled the appointment for October 20, 2005, despite TPDC's awareness that medical personnel had called for plaintiff to be seen by an orthopedist within two to three days of September 9, 2005. [*See*, doc. # 11-4, pg. 30; doc. # 11-3, pg. 33]. Moreover, the nurses' record reflects that Poole was notified of the delay in obtaining the orthopedic appointment. [doc. # 11-2, pg. 18].[20] Due to the delayed orthopedic care, plaintiff alleges that his arm failed to heal timely and that he suffered a deformity, with continuous numbing pain. (Pl. Amend. Compl., pg. 3).

In sum, the undersigned finds that the foregoing facts alleged by plaintiff, and as supported by his certified prison medical record, establish a sufficient basis for finding that defendant, Pam Poole, was personally aware that the failure to provide plaintiff with timely medical treatment and medication placed him at substantial risk of suffering serious harm.

---

[20] There is no evidence that the delay in scheduling the orthopedic appointment was due to the inability to obtain an earlier appointment at the orthopedic clinic. Even if the orthopedic clinic's appointment book was full for the next month, the record does not reflect why TPDC could not have scheduled an earlier appointment with another orthopedist.

Despite this knowledge, Poole made no determined effort to meet plaintiff's specific medical needs for an inordinate and unsupportable length of time.

It is not improbable that had Poole elected to defend the instant suit, she would have argued that the delay in obtaining plaintiff's needed medical care was attributable to IHS's refusal to approve treatment requests submitted on behalf of Lijadu. However, the medical record reveals that IHS did approve treatment requests once they were properly supported. Nevertheless, Poole repeatedly failed to pursue the matter with IHS or to otherwise effect alternative arrangements.[21] In the absence of any meritable explanation proffered by Poole, the undersigned is compelled to find that the evidence and allegations establish that Poole was deliberately indifferent to plaintiff's serious medical needs. *See, Alberti v. Sheriff of Harris County, Tex.*, 937 F.2d 984 (5th Cir. 1991).[22] Accordingly, Poole is liable, in her individual

---

[21] At times, plaintiff's complaint characterizes Poole's inaction as "negligence." (*See e.g.*, Pl. Amend. Compl., pg. 4). However, plaintiff's conclusory allegation is not dispositive, when as here, the facts demonstrate that Poole' culpability surpassed mere negligence. *See*, discussion, *supra*.

[22] In *Alberti*, the Fifth Circuit observed that the record contained strong evidence that state officials acted with deliberate indifference where despite knowledge of the cruel conditions of the county's jails, they chose to ignore the plight of the prisoners. *Alberti, supra*. In so holding the court relied upon former Justice Powell's decision in *LaFaut v. Smith*:
> [i]n *LaFaut*, a paraplegic prisoner alleged that prison officials had denied him adequate toilet facilities and necessary physical therapy in violation of the Eighth Amendment. In reviewing the district court's findings, Justice Powell noted that, although LaFaut specifically informed prison officials that his toilet facilities were inadequate, they made no attempt to modify the facilities for two months and, when their initial attempt failed, waited another month before transferring LaFaut to a cell with adequate facilities. Similarly, although LaFaut repeatedly requested physical therapy and official medical reports confirmed the need for therapy, he waited two months for minimal motion therapy and eight months for a transfer to an institution with adequate therapy.

Justice Powell concluded that, because there was no reason for the delays, the

capacity, for the constitutional deprivation of adequate medical care that plaintiff endured while confined at the TPDC. 42 U.S.C. § 1983.[23]

### d) Damages

For purposes of a default judgment, plaintiff's well-pleaded factual allegations are taken as true -- except regarding damages. *U.S. For Use of M-CO Const., Inc. v. Shipco General, Inc.*, 814 F.2d 1011, 1014 (5th Cir. 1987) (citation omitted). When, as here, plaintiff's claim is not for a sum certain, Rule 55 authorizes the court to conduct a hearing to determine the amount of damages. Fed.R.Civ.P. 55(b)(2). Alternatively, the court may rely upon detailed affidavits, documentary evidence, and its personal knowledge of the record to award damages. *See, James*

---

prison officials had been deliberately indifferent to LaFaut's needs:

> 'There is nothing in the record before us ... to justify the inordinate delays in accommodating appellant's needs in light of the practicality and availability of various solutions. Prison officials should not ignore the basic needs of handicapped individuals or postpone addressing those needs out of mere convenience or apathy. *As appellee Hambrick was the responsible official in charge of Butner, and she was fully advised both of the inhumane conditions of appellant's confinement and the failure to provide him with needed therapy we conclude that her neglect constituted "deliberate indifference" and therefore violated the Eighth Amendment.*

*Alberti*, 937 F.2d at 999 (quoting *LaFaut v. Smith*, 834 F.2d 389, 394 (4th Cir.1987)) (emphasis added).

[23] The undersigned did not discern any intention by plaintiff to sue Poole in her official capacity. Had he so intended, plaintiff still failed to demonstrate *inter alia* a policy or custom that caused the alleged constitutional deprivation. *See, Brooks v. George County, MS*, 84 F.3d 157, 165 (5th Cir. 1996) (addressing requirements of official capacity claim) (citing *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658, 690-691, 98 S.Ct. 2018, 2036 (1978)); *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989) ("In a Section 1983 case, the burden of proving the existence of an unconstitutional municipal policy or established custom rests upon the plaintiff).

*v. Frame*, 6 F.3d 307 (5th Cir. 1993) (citations omitted); *see also, Wilson v. Ameristar Casino Vicksburg, Inc.*, 2008 WL 4296563 (W.D. La. Sept. 19, 2008).

Since plaintiff now resides in Nigeria, a hearing is not feasible. Thus, plaintiff must adduce competent summary judgment evidence to support an award for compensatory damages. Insofar as he alleges permanent injuries suffered as a result of defendant's inaction, plaintiff must present medical evidence (e.g. from an examining physician) that links the permanent impairment(s) to the denial of adequate and timely medical care as alleged herein. For the transient injuries that plaintiff suffered during the time period that he was without adequate medical care, he should set forth specific details, via affidavit, regarding their effects and duration. Plaintiff shall file the foregoing evidence within the next 30 days from today so the district court may consider the submissions contemporaneously with its review of the instant report and recommendation.[24]

With regard to plaintiff's claim for punitive damages, the undersigned observes that such an award may issue under § 1983 "only if the official conduct is 'motivated by evil intent' or demonstrates 'reckless or callous indifference' to a person's constitutional rights." *Sockwell v. Phelps*, 20 F.3d 187, 192 (5th Cir. 1994) (citations omitted). The court's finding that Poole was deliberately indifferent to plaintiff's medical needs further supports a determination that she recklessly disregarded the risk of harm to plaintiff. *See, Campbell v. Miles*, 228 F.3d 409, 2000 WL 1056131, *3 (5th Cir. Jul. 20, 2000) (unpubl.) (*citing Sibley v. Lemaire*, 184 F.3d 481, 489 (5th Cir.1999)). Even if the evidence justifies an award of punitive damages, however, it remains

---

[24] Plaintiff is cautioned that if he fails to adduce the foregoing evidence, the court may be constrained to award only nominal damages.

within the trier of fact's discretion to make such an award. *Sockwell, supra* (citation omitted).[25] Accordingly, the undersigned will defer this issue to the sound discretion of the district court upon review of plaintiff's evidence regarding compensatory damages.

For the reasons set forth above,

IT IS RECOMMENDED that the motion for a default judgment filed by plaintiff Enitan Lijadu as a "Motion for Summary Judgment" [doc. # 75] be GRANTED, and that judgment be entered in favor of plaintiff and against defendant, Pam Poole, holding defendant liable, in her individual capacity, for the deprivation of plaintiff's constitutional right to adequate medical care. 42 U.S.C. § 1983.

IT IS FURTHER RECOMMENDED that compensatory damages be awarded in favor of plaintiff and against defendant, Pam Poole, in her individual capacity, in an amount established by plaintiff's prospective submission of competent summary judgment evidence, together with punitive damages, if warranted in the court's discretion.[26]

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) business days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of

---

[25] Indeed, because the purpose of punitive damages is to deter future egregious conduct, a punitive damages award may be inappropriate in the instant case because defendant is no longer employed at the TPDC. (*See*, notation on un-executed return of service [doc. # 24]); *Sockwell*, 20 F.3d at 192 (purpose of punitive damages is to deter future egregious conduct).

[26] The Clerk of Court is directed to mail a copy of this report and recommendation to Pam Poole at the address where service was perfected.

filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 7th day of January 2009.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE